LEMUEL and WILLIS B. LONG *vs.* JAMES M. GRANBERRY, Administrator, and others.

## At Columbia, July, 1874

BILL OF REVIEW—NEW PROOF—PRACTICE.—The application for leave to file a bill of review should be made by petition or affidavit separate from the bill, but may be made by bill so drafted as to embody all the requirements of the preliminary petition.

SAME—STATEMENT OF NEW MATTER.—The petition or bill must state the new matter so as to enable the court, as upon demurrer, to determine its relevancy, materiality, and controlling character, and that it is new and could not have been produced on the original hearing.

SAME—NEW PROOF—The new proof to sustain the application for leave to file a bill of review should be of so clear and decisive a character, whether written or oral, as to leave no doubt that it would, without reference to the evidence in the original cause, unless successfully met, compel a reversal of the former decree.

SAME—COUNTER-AFFIDAVITS.—Counter-affidavits are admissible on an application for leave to file a bill of review, not for the purpose of denying the new matter relied on, but to throw light on the character of the new proof, so as to enable the court the better to judge of its relevancy and materiality.

SAME—WITNESS.—It is no ground for a bill of review for newly-discovered evidence that the complainants are informed and believe that a witness, supposed to be dead at the former hearing, is now living somewhere in Texas, whose testimony may hereafter be had, and may be important, without showing what the testimony will be.

SAME—EVIDENCE OF CHARACTER.—New evidence to sustain the character of a witness examined on the former hearing is not "new proof" to sustain a bill of review.

*Whitthorne & Hickey*, for complainants.

*Thomas, Barnett & Myers*, for defendants.

THE CHANCELLOR:—This is an application by the complainants for leave to file a bill of review, "upon new proof that has come to light after the decree made, and could not possibly have been used at the time when the decree passed." Upon such proof a bill of review can only, under the ordinance of Lord Bacon, "be grounded by the special license of the court, and not otherwise." Beames' Orders in Chancery, 1. The application was made by motion, based upon the bill sought to be filed, and the affidavits of the persons whose testimony was relied on attached

thereto. It was subsequently more formally made by petition under oath, upon my suggestion that the case ought not to turn upon any question of form, and that this was the better practice, as laid down by text-writers and recognized by our supreme court. 2 Dan. Ch. Pr. 1638, 3d ed.; *Winchester* v. *Winchester*, 1 Head, 460, 464; *Frazer* v. *Sypert*, 5 Sneed, 100. " The practice of the court of chancery in England (said McKinney, J., in *Colville* v. *Colville*, 9 Head, 525) remains unchanged in this state." That practice was uniformly by petition sworn to, or affidavit separate from the bill. *Norris* v. *Le Neve*, 3 Atk. 33; Coop. Eq. Pl. 92; Story's Eq. Pl. 412; Dan. Ch. Pr. 1638. This is the reason why the rule as to the particularity of the statement of the newly-discovered evidence in the petition is well settled, while left in some uncertainty as to the like statement in the bill, as noticed by Judge McFarland, in *Burson* v. *Dosser*, 1 Heisk. 761. The importance of the original practice is obvious, because it enables the applicant to bring before the court all the facts and circumstances touching the new evidence necessary to the settlement of the preliminary question of granting or refusing the leave asked for, without burdening the record by matter only material on this point, and having no bearing on the merits of the bill when filed. Nevertheless, there has been a tendency of late years to ignore the distinction, and make the bill itself answer the purposes of the petition. And it is easy to see that the bill might, in most cases, be so drafted as to embody all the requirements of the petition, in which event, if properly verified, the application might be made by motion. In this, as in other matters, a court of chancery looks to substance, not form. *Massie* v. *Graham*, 3 McLean, 43. It ought to require that all the facts necessary to enable it to decide the preliminary question should be presented in the one form or the other; for then only can it exercise the discretion given, with full knowledge. If this be done, the bill, when allowed to be filed, will rarely be liable to a demurrer. Story's Eq. Pl. § 636. Undoubtedly,

however, the defendant may rely upon a demurrer even after formal leave given. Id.; 1 Heisk. 754. For leave may be granted upon an *ex parte* application, or improvidently, and yet the bill be clearly defective.

Upon the reading of the bill it struck me that it was not up to the full requirements of the law, and I suggested the propriety of the petition. But, in the hurry of preparation, the petition is not as full in some respects as the bill, and the affidavits attached. In order, therefore, that the application may be disposed of on its merits, and no injury be done to the complainants by the form adopted, I will consider the bill, petition, and affidavits as constituting an entirety.

The petition, or bill, as the one or the other may be resorted to, must show with particularity the nature of the new matter, in order that the court may exercise its judgment upon its relevancy and materiality. It must show that the matter is new, and could not, with reasonable diligence, have been produced or used by the party claiming the benefit of it in the original cause, and state the time when it was discovered. *Young* v. *Keighly*, 16 Ves. 350; *Young* v. *Henderson*, 4 Hayw. 189. The facts and circumstances should be set out so as to enable the court to draw its own conclusions, and it will not do to deal in allegations which are merely the conclusions of the party himself. *Bingham* v. *Dawson*, Jac. 243; *Frazer* v. *Sypert*, 5 Sneed, 100. The new matter must be so stated, to use the words of McFarland, J., in *Burson* v. *Dosser*, 1 Heisk. 761, as to enable the court to determine, upon a demurrer (and it may be added as upon a demurrer at the preliminary hearing), whether or not the newly-discovered testimony, when produced, will be of such a character as will make it controlling in the cause, or merely cumulative, and such as will not necessarily change the result; and so that the court may determine, from the nature of the new matter, whether the party has been guilty of any negligence in not discovering

and producing the evidence on the first trial. *Dexter* v. *Arnold*, 5 Mas. 309 ; Story's Eq. Pl. § 412.

To this extent all the authorities are in accord. But some courts have held that the new evidence must not consist of additional testimony of witnesses, but of stringent written evidence or newly-discovered papers. *Livingston* v. *Hubbs*, 3 Johns. Ch. 124 ; *Respass* v. *McClanahan*, Hard. 342 ; Story's Eq. Pl. § 415, note. And, if the testimony of witnesses is admitted, it should be done with great caution ; should not be merely cumulative, and, as intimated by Judge McFarland, in *Burson* v. *Dosser*, 1 Heisk. 763, should be sufficiently strong to change the result without being taken and considered with the evidence in the original case. And, at any rate, the new evidence should be clearly such as would have induced the court to have made a different decree. *Thomas* v. *Rawlings*, 34 Beav. 50 ; *Hungate* v. *Gascoyne*, 2 Phillips, 25.

The facts presented to the court by the complainants in the present application are, in substance, as follows : In the year 1867 Sabra T. Lawrence died intestate, leaving children and grandchildren as heirs at law and distributees, the complainants being grandchildren by a deceased daughter. The defendant Granberry qualified as administrator of her estate, and on the 10th of March, 1868, filed a bill against the heirs and distributees for a collation of advancements and settlement of his administration. On the same day complainants filed their cross-bill against said administrator, heirs, and distributees, and one Washington Boddie, a negro freedman, at one time a slave of the intestate, alleging, in substance, that Willis H. Boddie, a brother of the intestate, had died in Maury county, in July, 1841, seized of a large estate, real and personal ; that the intestate, being the only sister and heir of the said Boddie, took possession of his property as such heir, and appropriated the same to her own use, and afterwards gave off large portions of the *corpus* to her children and grandchildren. That complainants were then small boys, ignorant of their rights, and, upon arriving

of age, found their grandmother in possession, claiming the property as her own, and received some of the property as gifts from her. That they remained in ignorance of the real facts until a short time before filing their cross-bill. That they were now satisfied that said Boddie died having a will at the time of his death, which will " was wilfully and designedly suppressed and destroyed by Mrs. Lawrence, or some other person, to defeat the intentions of the testator." That by this will the whole estate, with the exception of some small legacies, was given to complainants. That, only a few hours before his death, the said Boddie called for his body-servant, Washington (made a defendant under the name of Washington Boddie), in whom for years he had reposed confidence, handed to him his will, with instructions to carry it to his neighbor John Dawson, to be by him kept; that Washington took the package and left the house, but the same was taken from him by the said Sabra T. Lawrence, and has never since been forthcoming. That Washington, immediately after the death of Boddie, was caused by the said Sabra T. to be arrested, sent to jail, placed in irons, sent to south Alabama, and sold, on account of his knowledge of the disposition of said will. That the bill prayed that the said will be set up, and for other relief consequent thereon. That the defendants filed their answers to said cross-bill, denying the allegations of the bill, and alleging that Boddie died intestate; that, if he ever made a will, he revoked and cancelled it in his life-time. Such proceedings were had in said cause that a final decree was rendered on the 4th day of August, 1871, to the effect that the complainants had failed to show themselves entitled to the relief claimed, " and that Willis Boddie had no last will and testament in existence at the time of his death, but that he revoked the same in his life-time *animo revocandi.*" And the cross-bill was dismissed, but without costs, which were charged on the intestate's estate. From this decree the complainants prayed and obtained an appeal to the supreme court. It is now alleged, upon this application, that while said suit was pend-

ing in said court, and before any decision was had, com-plainants discovered new and material proof, both of the existence of Boddie's will at the time of his death, and of its destruction by Mrs. Lawrence. That this proof was in exist-ence at the time of the rendition of the decree by the chan-cellor, but was unknown to complainants or their counsel until long after the appeal to the supreme court. That, upon the discovery of this new proof, complainants dismissed their appeal, leaving the decree below in full force, with the purpose of filing a bill review. That by no sort of diligence could complainants have availed themselves of the new proof on the former trial; that some of the witnesses were unknown to them, some non-residents of the state, and com-plainants were ignorant of, and had no means of finding out, what they could prove by said witnesses, or that they had any knowledge of the existence and destruction of Boddie's will, until after the decree dismissing the cross-bill. The new matter relied on is then set out, either in the petition or bill.

This application is based upon the discovery, since the former decree, of " new and material proof, both of the existence of Boddie's will at the time of his death, and of its destruction by Mrs. Lawrence." The new matter may be thus arranged:

1st. The supposed testimony of Washington.

2d. The testimony of Mrs. Key.

3d. The testimony of Hammond Webster.

4th. The testimony of Elizabeth Lawrence.

5th. Testimony to sustain the character of Beverley Law-rence, a leading witness on the former hearing.

It will be noticed that the original bill alleged that Willis H. Boddie, only a few hours before his death, called for his body-servant, Washington, and handed him his will to carry to his neighbor Dawson; that the will was taken from him by Mrs. Lawrence, and has never since been forth-coming. That Washington was shortly afterwards sent out of the state by Mrs. Lawrence, and sold, on account of his

knowledge of the disposition of the will. In this applica-tion special pains are taken to show that due diligence was used to obtain Washington's testimony. It is stated that one of the complainants went in person to south Alabama, and had learned that the year before he was living some-where in Texas ; that efforts were made, through the Freed-man's Bureau, and otherwise, to find him in that state, but without success, and complainants were compelled to go to trial in the absence of his testimony, and under the impres-sion, it seems, that he was dead.

The allegation now is this : " Complainants further state that, on the 27th day of June, 1874, they are informed and now believe that Washington is still living, and resides in the state of Texas, and that they will be able to get his evidence, if leave is given them to file their bill of review, which will establish fully the existence of the will at the death of Mr. Boddie, and its destruction by Mrs. Lawrence."

The new matter, for it can in no sense be called " new proof," is that, within a few days past, complainants are "informed and now believe" that Washington is living in Texas. The court is not advised of the source of this information, so as to be able to judge of its trustworthiness, nor the precise character of it, so as to form an opinion whether the place of residence is more definitely ascertained than at the first trial. For aught that appears it is an idle rumor, or an echo of what the complainants learned from the visit to Alabama—that he was somewhere in the state of Texas. It is scarcely necessary to say that this is not the " particularity " required by law in such applications. The circumstances should be so stated as to enable the court to decide whether the complainants' " information and belief" have any solid, or even plausible, foundation. To leave the point to the party's own judgment would be to make the right to file a bill of review depend upon the discretion of the litigant, and not of the court.

If the bill of review were grounded upon this matter

alone, it is obvious that it would not come within the ordinance of Lord Bacon at all. The complainants do not pretend that they know what proof can be made by Washington, nor do they bring before the court the affidavit of any credible witness as to what he will prove. The allegation is, merely, that there is such a witness now living, as they are informed and believe, somewhere in Texas, whose testimony *may be* hereafter had, and which testimony *may be* important upon the trial of the issue. I know of no law which authorizes an application upon such ground.

It is an error to suppose that because, upon a motion for a new trial at law, in some exceptional cases, the evidence of the witness relied on may be dispensed with, upon good cause shown why it cannot be obtained, that the like rule prevails upon applications for leave to file a bill of review. The analogy between the two classes of cases is very slight. The resemblance is really between a motion for a new trial and a petition for rehearing. The bill of review is more like a bill filed for the purpose of having a new trial after a judgment at law. In both cases the application must be based, not upon what the complainant supposes can be proved, but upon what he satisfies the court can be proved. Such applications can never be based upon possibilities, but must be grounded upon certainties; otherwise, there would never be an end to litigation. *Thomas* v. *Rawlings*, 34 Beav. 50.

Besides, the ordinance is "upon new proof that has come to light after the decree made." But no "new proof" has been obtained from the witness at all. It is the same old proof which it was supposed he could make at a former hearing. That a witness could not be had at the first trial is no ground for a bill of review, or even for a new trial, unless, indeed, the witness were purposely kept away by the opposite party, and then only upon showing by him what his testimony will be. That the witness was originally sold out of the state thirty odd years ago can in no sense be construed into a keeping him out of the way now.

The present application, so far as it rests upon the sup-posed testimony of Washington, is clearly defective, and must be disallowed.

The new testimony of Mrs. S. H. Key is thus stated: Complainants can prove by Mrs. S. H. Key, of Alabama, that Mrs. Lawrence, while on a visit to Mrs. Key, in that state, had repeated conversations with her, in which she said "she knew Mr. Boddie always kept a will; that she knew he had a will, and always, when referring to it, would become greatly affected." The material point of this new matter seems to be the exhibition of feeling, upon the part of Mrs. Lawrence, when speaking of the will. The visit during which these conversations were had was made, it. appears from the affidavit of the witness herself, attached to the bill, in the winter of 1841–2, and, therefore, shortly after the death of Mrs. Lawrence's brother. And the language of the witness is : " And in her frequent allusions to the death of her brother, and the mention of the will, she seemed much affected." The application assumes that. Mrs. Lawrence became " greatly affected " at the mention of the will; whereas it would be much more natural to attribute it to the " allusions to the death of her brother." The juxtaposition of the two causes reminds us, somewhat too aptly, of the exclamation of the duke over the tragic rhetoric of Bottom : " This passion, and the death of a dear friend, would go near to make a man look sad." It is, of course, out of the question to lay serious stress upon this. " new proof."

The next ground upon which the application is based is the testimony of Hammond Webster to a conversation between the intestate and the witness' mother, parts of which he deposes to having overheard. This conversation, according to the statements of the witness made in his deposition taken to perpetuate his testimony, took place in the public road, the ladies conversing with each other from their buggies, and in the year 1865 or 1866. The witness was. then thirteen or fourteen years of age, and was driving his.

mother's buggy. After conversing in ordinary tones about various matters, the two ladies lowered their voices and began to talk in whispers. " I tried," says the witness, " to hear what they said, and did hear some words; they were few, and in broken sentences. As well as I remember, Mrs. Lawrence was talking. She said 'we' or 'he' (the two words sound so much alike I could not tell which it was) took it. Then there was something else said, and I heard the word 'away,' then I heard 'garden,' and then 'burnt it.' I do not know that I heard the word it, but it was burned. None of these words were connected at all. I put them together to suit myself. When she said 'burn,' she commenced crying. Then my mother spoke to her— rather consoling her—never mind that now; you can't help it; just make it right, or make it right when you die, or make it up when you die, I cannot say which. I think she said make it right when you die. Mrs. Lawrence said that was what she intended to do. She said it worried her mightily. What it was I did not know, but had an impression." This impression, as given by the witness, was altogether foreign to the matter in controversy in this case. He is asked whether his mother told him what the conversation was about, but the question was objected to, and the answer excluded. The bill alleges that she told him that the conversation related to the destruction of Mr. Boddie's will, and that the witness concealed his knowledge, because of a solemn pledge made to his mother, until after the trial of the cause by the chancellor, and then, thinking that it was too late to make him a witness, allowed the facts to be drawn out of him by one of the complainants, in a private interview.

It is clear that the *disjecta membræ* of the conversation, as heard by the witness, amount in themselves to nothing. The words " we " or " he " took it, then—after something else had been said—" away," then " garden " and " burnt," with like intervals of conversation not heard, make no sense, and cannot be connected together in any legitimate

sequence. Besides, not one of these words is of such significance as to connect the conversation with any supposed destruction of Boddie's will. Neither the word "will" nor the name "Boddie" is used. It would be a deduction utterly unwarranted by the context, or by any known rules of logic or association of ideas, to connect these scattered words with an event which happened a quarter of a century before, and long before the witness was born.

This was tacitly conceded by the learned counsel of the complainants, in their able arguments in support of this application. Nor was any effort made by them to sustain the competency of any testimony to the effect that the witness' mother afterwards told him that the conversation did relate to the burning of Mr. Boddie's will. Nor am I aware of any principle of evidence which would make such testimony admissible in a contest between the parties to this bill of review. Besides, no such testimony is produced. The witness was not permitted to answer the question put to him, enquiring whether his mother told him what the conversation was about, and we cannot know what his answer would have been. The scattered words are all the "new proof" of this witness.

The applicants next allege that they have "new proof" in the testimony of Elizabeth Lawrence, whose affidavit is attached to this bill, who states that in the year 1866 she had a conversation with Mrs. Lawrence, at her residence, in which she spoke of the death of her brother, and of his having made a will. The language of the affidavit is as follows: "She (Mrs. Lawrence) stated to affiant that her brother made his will, and, while he was very sick and believed he was going to die, gave his will to a boy named Washington, with directions to take it to Mr. Dawson. That she (Mrs. Lawrence) took the will from Washington and destroyed it. She told affiant that the reason why she destroyed the will was that she thought it better to keep the property together, and divide it equally among all the children. She stated, further, that she had bought land,

and given the children homes, to keep from having any disturbance in the family about the division of the property. Affiant further states that she never communicated this conversation to complainants, nor to their attorneys, until since the trial in the chancery court." The affidavit of the witness is signed by affixing her mark.

In this connection, for a reason that will presently appear, we may notice the last new matter relied on. The bill alleges that one of complainant's chief witnesses, Beverley Lawrence, was to some extent impeached on the former trial; that they have since learned, and now believe, that they can sustain and establish for this witness a good character.

This last ground of application was not even noticed by the learned counsel of the complainants, in their able arguments in support of their client's cause. And it is too clear for comment that new evidence to sustain the character of a witness is no ground for a bill of review. For, in the first place, proof of character, which turns upon the knowledge of the neighbors and acquaintances, may always be had at once, and " new proof " cannot be predicated of a matter of such public notoriety; and, in the second place, the proof could not be otherwise than cumulative, in the strictest sense of that word.

This allegation was probably thrown in for the purpose of eventually aiding the testimony of Elizabeth Lawrence, who, although the fact does not appear upon the face of the papers constituting this application, turns out to be a negress, the wife of Beverley Lawrence. At the instance of the defendants I gave them leave to present counter-affidavits, not for the purpose of denying the new matter relied on, for that would be to try the truth of the averments in the disposition of the preliminary question, but to explain the new proof, so as to enable the court the better to judge of its relevancy and materiality. This practice is manifestly necessary, to bring all the circumstances before the court essential to the exercise of its discretion, and is sanctioned

by authority. *Dexter* v. *Arnold*, 5 Mas. 308. From the affidavits thus introduced it appears that the said Elizabeth Lawrence is the wife of Beverley Lawrence; that they were married in 1865, in Williamson county; that they came to this county, and went to live with Mrs. Lawrence, in July, 1866, and left there the next Christmas; that she never was owned by Mrs. Lawrence, nor, so far as appears, known by her previous to July, 1866. The facts are tacitly admitted by the complainants, and are, in reality, sustained by their own statements, as far as they go, made in the petition. They there say that this witness was a stranger to them; that she came from Williamson county to Maury county in 1865 or 1866; that she has lived in a different part of the county from them most, if not all, of the time, and they have no knowledge of ever having seen her, to know her, until after the final decree in the original cause.

The testimony of this witness is certainly very much to the point; too much so, in fact, unless presented in connection with all the circumstances, and the utmost " particularity " of time, place, and occasion, tending to explain its occurrence, and giving it the semblance of truth. Nothing of the kind appears in the bill, or petition, or affidavit of the witness herself. It was undoubtedly incumbent upon the petitioners to have given the court the opportunity of judging of the evidence by some other light than can be gathered from the naked assertions. Statements of what persons may have said in casual conversation are ordinarily the least reliable of all testimony, especially when not addressed to the witness. *Ex parte* Carr, 3 V. & B. 112; *Suggett* v. *Kitchell*, 6 Yerg. 430. The mistake, or oversight, of a word may change the entire sense. *Driver* v. *Cobb*, 1 Tenn. Ch. 492. On the other hand, direct and positive admissions, made under such circumstances as to show deliberation and intention, are entitled to grave consideration. As this testimony comes before us, we are called upon to believe that Mrs. Lawrence has passed by all the friends and acquaintances of her own race, and all those individuals of the wit-

7

ness' race who had been members of her own family, under
the ties of slavery, and made a confidant of a negro woman
with whom she was a stranger, and who only remained in
her employment from July until January of a single year.
The draft is somewhat too large upon our judicial credulity.

There is another difficulty in regard to this evidence.    No
bill of review lies upon new proof which the complainant
might, by proper diligence, have had at the former trial.
*Young* v. *Forgey*, 4 Hayw. 189.    The complainants them-
selves show that Beverley, then and now the husband of
Elizabeth, was a most important witness on the former trial,
being the only witness who undertook to prove the delivery
by Boddie of his will to Washington, and that his character
for veracity was then impeached.    The testimony of his
wife, as now presented, would, it is obvious, have fully sus-
tained him.    And, although the witness states that she has
not until since that trial communicated her knowledge to
complainants, or their solicitors, she does not say that
she never previously mentioned the fact to others, and
especially to her husband.    The petitioners do not show
how they received their information of what her proof would
be, but they do state that it was not from her, but from
another.    She must, therefore, have talked about the matter
to others, or another.    The facts as given tend to show that
the evidence was known to some one, probably Beverley,
and might have been had by reasonable diligence.

The new proof relied on, when weighed  separately, is,
therefore, found wanting.    It remains to be considered
whether it is entitled to more weight when taken as a whole.
There is high authority, as we have seen, for the position
that the new proof must be some stringent written evidence,
or newly-discovered papers.    But, whether this be so or not,
it is clear that when testimony of witnesses is admitted to
establish the new matter, it should be done with great cau-
tion, as tending to open the door to perjury, and only, to
use Chancellor Kent's language, "when it is of such a
nature as ought to be decisive proof."    *Livingston* v.

*Hubbs,* 3 Johns. Ch. 124. It seems agreed that mere accumulation of witnesses, or cumulative testimony, is not sufficient. Cumulative evidence is, ordinarily, that which goes to prove the same point which has been established by other evidence. Bouv. Law Dict., *voce Cumulative.* The mere fact that the "new proof" is of a different character from any evidence brought to establish the same point, does not take it out of the rule. If it were true, as contended for by the counsel of petitioners, that there was no proof, on the former hearing, of the admissions of Mrs. Lawrence, tending to show that the will of her brother had been suppressed or destroyed by her—and the position is by no means free from doubt—it would not follow that the testimony of Elizabeth Lawrence is not cumulative of the other evidence relied on at the trial. The point involved was expressly ruled in *Burson* v. *Dosser,* 1 Heisk. 763. The new proof, in that case, was that McClure had admitted that the purchase money was satisfied. This, says the court, "was the proposition controverted in the original cause." The only evidence relied on by the petitioner, at the first hearing, to establish this proposition was the testimony of Broyles (see p. 757), who did not depose to any admission of McClure to him. Yet the learned judge who delivers the opinion of the court expressly says, "that this new testimony is merely cumulative, is evident" (p. 763).

When it is said that the new proof should not be cumulative, it is meant that the evidence should not be *merely* cumulative—nothing but an accumulation of the testimony to the same fact—but it should be something more, namely, "of such a nature as to be decisive proof." In other words, besides being additional evidence to the same point, "it should be sufficiently strong to change the former result," without reference to the evidence in the original cause. No bill of review should be allowed unless the "new proof" is of so clear and decisive a character, whether written or oral, as to leave no doubt that of itself it would, unless successfully met, compel a reversal of the former ruling. New

proof of so conclusive a character will rarely ever be found, unless it be documentary. This is the true test, and is clearly expressed by Judge McFarland, in *Burson* v. *Dosser*, 1 Heisk. 763. "Whether," he says, "it (the new testimony) would be sufficiently strong to change the result, could not be determined from the bill, but only upon consideration of the additional testimony, when taken and considered with the evidence in the original cause. If this be a good ground for a bill of review, there would probably be but few seriously contested cases where grounds equally strong might not be presented. Parties, after a trial, and after discovering the ground upon which they failed, would too often discover that, upon another trial, they could maintain their side of the contest with more evidence and greater skill. This would open the doors to endless frauds and perjuries."

The new matter brought forward in this case is all strictly cumulative, within the meaning of the word as defined above, and is wholly insufficient to make out the complainants' title to relief without taking into consideration the evidence in the original case. The application for leave to file a bill of review must, therefore, be refused.